Opinion by Judge KLEINFELD; Concurrence by Judge BERZON.
KLEINFELD, Circuit Judge:
We address three issues: 1) whether a certificate of appealability is needed to appeal a district court’s order denying a writ of habeas corpus arising out of a state’s denial of parole; 2) whether federal constitutional law imposes on the states a requirement for some quantum of evidence to support a state’s denial of parole; and 3) whether, even if there is no general federal quantum of evidence requirement, applicants for parole in California, under the state’s current laws, may obtain federal habeas review of whether there is “some evidence” supporting a negative parole decision.
FACTS
In 1978, Hayward’s girlfriend was out shooting pool on a “girls’ night out,” while he stayed home. While she was out, a man acted abusively toward her. There are varying accounts. It is not clear whether the man slapped Hayward’s girlfriend, or she spat in his face, or he spat in hers, or whether, as Hayward once claimed, the man chased her out into the parking lot, tore off some of her clothes, and tried to rape her. Subsequently, Hayward spent months keeping his eyes open for the man so he could exact revenge.
Several months later, Hayward got a call saying that the man who abused his girlfriend, Tom Strauss (also known as Tom O’Connor), was at the Buccaneer Bar. Hayward enlisted some of his fellow gang members to go with him to the bar because he wanted to “kick his ass.” One of Hayward’s gang knocked Strauss down. Then Hayward stabbed Strauss twelve times in the back, killing him. In 1980, Hayward was sentenced to fifteen years to life for murder.
*550 Since completing the first fifteen years of his sentence, Hayward has repeatedly been denied parole. He now petitions for a writ of habeas corpus, claiming that he is constitutionally entitled to be paroled.
Hayward phrases his petition for a writ of habeas corpus as a challenge to then-Governor Gray Davis’s 2003 decision to overturn a grant of parole by the California Board of Prison Terms.[2] That decision was not the end of the state proceedings, but is worth summarizing. The Board of Prison Terms had found Hayward was suitable for parole, but wrote, in accord with California law: “[ijnmate not to be released until Governor exercises review authority.”[3] The Governor, exercising his discretionary review authority under California law, denied parole and explained his disagreement with the Board of Prison Terms.
After weighing a multitude of discretionary factors, Governor Davis concluded that “Hayward would pose an unreasonable risk to public safety if released at this time.” One factor was Hayward’s “particularly heinous crime.” Hayward stalked his victim for months. When he located the victim he arranged for members of his motorcycle gang to join him. They set out to subdue the victim, who was drunk and recuperating from two broken arms. Hayward stabbed Strauss in the back twelve times, twice to the hilt. After the stabbing, Hayward fled while his victim bled to death. Two witnesses later said that they and their families received death threats intended to keep them from testifying.
Another factor was Governor Davis’s concern about the sincerity of Hayward’s remorse. For his first fifteen years in prison, Hayward denied responsibility and disparaged the victim, saying “[Strauss’s] family is lucky he’s dead.” Even after Hayward finally admitted to his crime in 1993, he told a psychological evaluator that he felt good about killing Strauss.
The Governor was also concerned by Hayward’s substance abuse and his need for further substance abuse therapy. Hayward began using heroin when he was twelve. He subsequently used LSD, POP, methedrine (methamphetamine), cocaine, marijuana, and excessive alcohol. Prison did not stop Hayward’s criminal drug use. He was disciplined for marijuana possession and admitted that he “ran drugs in prison.”
Before this prison stretch for murder, Hayward was active in a gang (the same gang that helped him murder Strauss). Hayward claims he “retired” from his motorcycle gang while in prison. As with the drugs, though, prison did not end Hayward’s involvement with gangs. The Governor noted that Hayward “received a serious disciplinary report for leading a white racist organization, using the organization to intimidate inmates, directing assaults and advocating violence against black inmates.” Hayward continued his white-racist gang involvement until mid-1989.
*551 The Governor also considered Hayward’s extensive criminal history in addition to this murder. The murder was not an aberration. As a juvenile, Hayward was arrested approximately twenty times, starting at age eight. He had about sixteen arrests as an adult. During all the time he was out of prison, he never quit committing serious crimes. Hayward admitted involvement with a criminal group “responsible for [75] to [120] very serious crimes including arson, assault, kidnapping, robbery and possession of a large cache of stolen explosives.”
The Governor took Hayward’s moderately favorable mental health evaluation into account, but weighed it against other factors. A psychological evaluation of Hayward’s mental health found that “historical factors” were on the “negative side.” But, “[o]n the positive side is the lack of overt violence during the last twenty years of incarceration, his being disciplinary free for the last thirteen years, an increased level of maturity and insight, his participation in substance abuse recovery, his participation in self help and spiritual activities, and his being older and mature.” The psychologist’s conclusion was that Hayward posed “a low to moderate risk for future violence in the community.” The Governor, however, thought that the risks Hayward posed “remained] too high to risk releasing him into our community” because of Hayward’s “long criminal history, increasing violence, and gang participation.”
The Governor’s decision was not the end of the case in California. In the California system, if the Board of Prison Terms recommends that a prisoner be paroled, the Governor reviews the recommendation and makes his own decision. That decision is subject to judicial review via a prisoner’s state habeas petition.[4] Under California law, the state courts review the Governor’s decision and the record for “‘some evidence’ that an inmate poses a current threat to public safety.”[5]
The Superior Court of California, County of Los Angeles, reviewing the record, determined that Hayward claimed he went to the bar to beat up the victim, rather than to kill him. The Superior Court noted that, prior to his conviction for killing Strauss, Hayward was acquitted of attempted murder, but his prior offenses ranged from armed robbery (as a juvenile) to assault with a deadly weapon on a police officer. The Superior Court also found that Hayward “received four 115 disciplinary violations for ‘serious’ misconduct, the most recent in 1989.” It then considered Hayward’s expressed remorse, vocational training, and plans for parole. The Superior Court held that although some of the Governor’s findings were not adequately supported by the record, others were, and that was sufficient to justify denial of parole.
Hayward petitioned for a writ of habeas corpus in the California Supreme Court,[6] which summarily denied his request. He then petitioned for a writ of habeas corpus in federal district court. The district court denied the petition and we now affirm.
*552 ANALYSIS
Both we and the California Supreme Court have been engaged in modification of the law to determine what limits there are on denial of parole. We have two decisions, Irons v. Carey[7] and the panel decision in this case,[8] saying that due process requires “some evidence,” not merely a discretionary judgment, if parole is denied. We address these propositions below. After oral argument in this case,[9] two California Supreme Court cases, In re Lawrence[10] and In re Shaputis,[11] held that under California law, some evidence of future dangerousness is a necessary predicate for denial of parole. Hayward’s appeal addresses what if anything the federal Constitution requires as a condition of denial of parole.[12]
I. Certificate of appealability.
This case is an appeal from a district court order denying a writ of habeas corpus to a state prisoner who seeks habeas relief after California denied him parole. Our jurisdiction to review the denial arises under 28 U.S.C. § 2253(a).[13] However, a petitioner may not appeal a “final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court,”[14] unless a “circuit justice or judge issues a certificate of appealability.”[15] We will only issue a certificate of appealability “if the applicant has made a substantial showing of the denial of a constitutional right.”[16]
Hayward did not request or obtain a certificate of appealability from the district court or, initially, from this court. He argues that a certificate is unnecessary on the theory that his detention “arises out of’ an administrative determination, the denial of his parole by the Board of Prison Terms, not a judicial determination “issued by a State court.” [17] He has support for his theory in our decision in White v. Lambert.[18] We held in White that a certificate of appealability is not required “when a state prisoner challenges an administrative decision regarding the execution of his sentence,” as opposed to the fact of his conviction.[19] Our sister circuits are divided on whether a certificate is needed to appeal denial of habeas relief in such circumstances.[20]
*553 The standard for a certifícate of appealability is lenient.[21] Hayward need only “ ‘sho[w] that reasonable jurists could debate’ ” the district court’s resolution or that the issues are “ ‘adequate to deserve encouragement to proceed further.’ ”[22] This showing requires “something more than the absence of frivolity,”[23] but something less than a merits determination (which we lack jurisdiction to make, absent a certificate of appealability).[24] The requirement of a certificate of appealability serves as a threshold requirement, a sine qua non to screen out prisoner petitions that ought not to take up additional judicial resources beyond those already consumed before state courts, federal magistrate judges, and federal district judges.[25]
Hayward was justified, because of our decisions in White[26] and Rosas v. Nielsen,[27] in proceeding without seeking a certificate. The statute requires a certificate of appealability if “the detention complained of arises out of process issued by a State court.”[28] We reasoned in those cases that a prisoner challenging denial of parole is challenging confinement resulting from an administrative decision, not confinement “arising out of process issued by a State court,” so the statute does not require the certificate. Our sister circuits have generally rejected our reasoning.[29]
The stronger literal argument supports requiring a certificate. The statutory requirement of a certificate of appealability turns on “the detention complained of.” On the one hand, what keeps the prisoner in prison is denial of parole. On the other hand, what put him there was a state court judgment convicting and sentencing him. Several of our sister circuits reason that the “detention” referred to by the statute is the state court decision that put the would-be parolee in prison, not the administrative decision not to let him out.[30] The California Board of Prison Terms does not have the authority to detain prisoners, just to release them from detention (subject to gubernatorial approval), so its decision cannot be the “detention complained of.”[31] Even if one were to treat the power to release as the power to detain, the administrative decision by the parole board or by the governor is not the last word in the *554 California system, and neither can deny release if the Superior and Supreme Court of California overturn their .decisions on review. Thus even if we were to look at what kept the prisoner confined as opposed to what caused him to be confined in the first place, a court decision is the target of this habeas petition in federal court.
If we look to function, the better construction of the certificate of appealability statute likewise requires a certificate of appealability. We are unable to think of a purpose Congress might have had for a contrary reading. What the requirement of,a certificate of appealability does, and all it does, is screen out of. the federal appellate courts claims that are not even debatable among reasonable judges, which is to say, frivolous claims. We cannot think of a reason why Congress might want to confer on-us jurisdiction to hear frivolous prisoner challenges to administrative decisions but screen out frivolous prisoner challenges to court decisions. Neither could the District of Columbia Circuit: “We do not think the Congress intended to limit federal review of a sentence imposed by a state court while allowing an unfettered appeal from a parole decision declining to decrease the time served thereunder.”[32]
It is also considerably more practical for the petitioners themselves to have a clear, simple, across-the-board requirement. Habeas jurisdiction, more than most, is a maze of curlicues and cul-de-sacs, with nowhere near enough straight, clearly marked roads. Usable law needs to be clear enough so that people trying to do the right thing can. Prisoners most often petition pro se, so they especially need clear road signs. Complicating jurisdiction rules for habeas appeals merely increases the randomness and decreases the justice of dispositions. The more distinctions and exceptions we build into the already overly complicated subject of habeas jurisdiction, the more the outcomes result from chance rather than the merits. The statute is best read to mean that a state prisoner seeking to appeal denial of a petition for a writ of habeas corpus to a federal court of appeals must get a certificate of appealability.
This simple rule would be troubling if it screened out cases that ought to get review, but the standard and procedure for certificates of appealability protects against that. All a prisoner needs is an issue debatable by reasonable jurists.[33] And if the prisoner neglects to request a certificate of appealability before going forward, the court of appeals can grant him one sua sponte.[34]
We therefore overrule those portions of White and Rosas which relieve a prisoner from obtaining a certificate of appealability from administrative decisions such as denial of parole and prison transfer. A certificate of appealability is necessary to confer jurisdiction on this court in an appeal from a district court’s denial of habeas relief in a § 2254 case, regardless of whether the state decision to deny release from confinement is administrative or judicial. Hayward needs a certificate of appealability if we are to maintain jurisdiction over this case. We may issue such a certificate sua sponte>[35] Hayward -had followed our *555 prior decisions when he proceeded without a certificate, and he has “made a substantial showing of the denial of a constitutional right”[36] in the sense that his claim is debatable among reasonable jurists, so we hereby certify for appeal the issue of whether “some evidence” was a constitutional sine qua non for the state’s denial of parole.
II. Constitutionality of California’s denial of Hayward’s parole.
A. No federal “some evidence” rule in the air.
Our decision today arises from Irons v. Carey,[37] and our earlier decision in this case.[38] These decisions may be read to mean that a parole-eligible prisoner has a constitutional right to be released unless there is “some evidence” of future dangerousness. If there is any right to release on parole, or to release in the absence of some evidence of future dangerousness, it has to arise from substantive state law creating a right to release. To the extent our prior decisions including Biggs v. Terhune,[39] Sass v. California Board of Prison Terms,[40] Irons v. Carey[41] and our panel decision in this case[42] might be read to imply that there is a federal constitutional right regardless of whether state law entitles the prisoner to release, we reject that reading and overrule those decisions to the extent they may be read to mean that.[43]
B. Good time.
The proposition that the Supreme Court has required “some evidence” of anything derives from a misunderstanding of the differences between “good time” and parole[44] We speak now to the commonalities of good time and parole, and address the particularities of California law in the next section of this opinion.
Prisoners usually get released before their sentences are over. In many jurisdictions, there are two paths to early release, good time and parole. They differ.
Good time is a prison discipline device. Prisoners get a certain number of days of good time for each month or year of their terms, and lose days if they misbehave in prison. The misbehavior does not have to be criminal, and the credit does not depend on predictions of good behavior outside prison. For example, federal prisoners serving terms of more than a year get up to fifty-four days of good time per year, credited at the end of the year, for “exemplary compliance with institutional disciplinary regulations.”[45] Accordingly, a federal prisoner sentenced to ten years imprisonment, who obeys the rules in pris *556 on, will be released after serving nine years and four months.
States likewise typically assign mandatory good time to all prisoners, which they can lose in increments for discipline violations in prison. Good time is designed to give prisoners an incentive to obey prison rules. The right to good time and the losing of it generally depend on how the prisoner behaves in prison, not what he did to be sent there or how authorities think he will behave after he gets out.
Because it is ordinarily a fixed, specific entitlement lost on the basis of misconduct, good time is a right to liberty, that is, release from prison, that can be taken from the prisoner only with due process of law. The “some evidence” standard is the quantum of due process that a prisoner charged with a discipline violation that would cost him good time is constitutionally entitled to.[46] If his misconduct cannot be proved by at least some evidence, he is entitled to his good time. This standard gives the prisoner some protection against the risk of mistake, losing his good time for misconduct he did not commit.
Many states use good time more or less like the federal system.[47] For example, Alaska state prisoners, with some exceptions, are “entitled to a deduction of one-third of the term of imprisonment rounded off to the nearest day if the prisoner follows the rules of the correctional facility.”[48] The California scheme is considerably more complex than the federal or typical state system and has changed frequently, but generally prisoners with determinate sentences, “shall be credited with a one-fourth reduction on their term of imprisonment, unless all or part of such good behavior credit is denied or forfeited as a result of disciplinary action in the amounts listed in section 3323.”[49] The California statute has a schedule of how much good time can be lost for different offenses, for example, up to 360 days for murder or rape, 180 days for other prison misconduct that could be prosecuted as a felony, 90 days for misdemeanor misconduct, and 30 days for a “serious disciplinary infraction” as defined by regulation.[50]
Though the details vary from state to state, good time statutes and regulations have several things in common. First, good time is a right, not a discretionary award.[51] This “liberty interest,” as our cases call it, is not a procedural right to be considered for a discretionary benefit. Rather, this is a liberty interest of the most fundamental sort, the prisoner’s right to walk out the prison gate and hear it *557 clang behind him.[52] Second, good time is lost after discipline proceedings for violations of prison rules committed while behind bars.[53] Third, the number of days is arithmetically calculable, so a prisoner knows when he enters prison that if he complies with the rules, he will be released a certain number of days before the end of the term to which he was sentenced.[54] Fourth, any loss of good time is historical, not predictive. Good time is taken away because of something the prisoner has already done, as adjudicated in a discipline proceeding, not for something he may do in the future. Prisons use the entitlement to good time, and reductions in good time, to give the felons in their charge an incentive to behave themselves while in prison, to avoid a situation where a prisoner might think he has nothing to lose.[55]
C. Parole.
Parole, by contrast with good time, typically involves “purely subjective appraisals” that turn on a “discretionary assessment of a multiplicity of imponderables.”[56] Parole, unlike good time, has been abolished in the federal system.[57] California and many other states still use it.[58] In Alaska, for example, an eligible prisoner may be granted “discretionary parole”[59] after serving one-third of the term of imprisonment to which he was sentenced.[60] Parole is at the discretion of a board that considers numerous factors, such as whether there is a “reasonable probability” that the prisoner, once released, will not violate any laws or parole conditions, “pose a threat of harm to the public” and “release of the prisoner would not diminish the seriousness of the crime.”[61] Thus in *558 the not a typical Alaska system, a prisoner may get out in one third of the time he is sentenced to, if he conforms to prison rules during that time and appears likely to continue to behave himself after release.[62]
Parole statutes differ from good time statutes first, in that they are at least in part prospective and predictive. Instead of or in addition to looking back to a fact, whether the prisoner broke a law or rule, they look forward, based in part on a judgment about how the inmate is likely to behave if released. Second, they depend on highly subjective and discretionary judgments, because the future is not yet a fact and can never be proved like a historical fact. Third, an inmate can control the outcome of good time credits by behaving himself in prison, but cannot control the outcome of the parole board hearing by his behavior (though it may influence their discretionary judgment). He can be turned down for parole at the parole board’s discretion, even when he would have an absolute entitlement to good time.
For example, suppose a prisoner is imprisoned for committing a very serious crime. The nature of the crime, his psychological and psychiatric assessments, and his own letters and statements to prison authorities, establish that he is highly likely to commit the same kind of crime or something worse if he gets out. In a state with good time credits, the felon would still get out before the end of his term if he complied fully with all prison rules. But because of the risk to public safety, he would almost certainly not be paroled. He would get out only as early as his good time entitled him to, and not any earlier despite the possibility of parole to a similarly situated prisoner with a better prognosis.
D. The constitutional distinction between good time and parole.
The relevant Supreme Court decisions require “some evidence” for denial of good time, but do not require it for denial of parole, and they carefully distinguish *559 good time from parole.[63] There is no general federal constitutional “some evidence” requirement for denial of parole, in the absence of state law creating an enforceable right to parole.
Hayward argues that the Supreme Court holding requiring “some evidence” to justify denial of parole is Superintendent v. Hill.[64] That decision is not on point, because the holding in Hill addresses good time, not parole. Hill relied on Wolff v. McDonnell,[65] the Supreme Court’s seminal “good time” revocation case. Wolff explains that good time “is qualitatively and quantitatively different from the revocation of parole or probation.”[66] Wolff holds that revocation of good time requires, inter alia, “that there must be a ‘written statement by the factfinders as to the evidence relied on and reasons for the disciplinary action.’ ”[67] Wolff explained that “the provision for a written record helps to insure that administrators, faced with possible scrutiny by ... perhaps even the courts, where fundamental constitutional rights may have been abridged, will act fairly.”[68] Relying on Wolff, Hill holds that, to take away a prisoner’s good time, due process requires there to be “some evidence” of a disciplinary infraction.[69] It does not hold that “some evidence” is required for denial of parole.[70]
The Supreme Court decisions addressing parole determinations[71] suggest (though they do not explicitly hold) that the “some evidence” requirement does not apply to denial of parole. In fact, the court has expressly distinguished good time from parole.
Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, addressing a claimed right to parole, holds that “[tjhere is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence.”[72] The Court distinguishes parole from parole revocation, because revocation is a “wholly retrospective factual question,” [73] but release on parole “depends on an amalgam of elements, some of which are factual but many of which are purely subjective appraisals.”[74]
*560 Greenholtz emphasizes that parole is a discretionary,, predictive decision.[75] Parole decisions are “ ‘equity’ type judgments] that cannot always be articulated in traditional findings” because “the choice involves a synthesis of record facts and personal observation filtered through the experience of the decisionmaker and leading to a predictive judgment as to what is best both for the individual inmate and for the community.”[76] The Court rejects the due process argument for a “some evidence” standard: “nothing in the due process concepts as they have thus far evolved that requires the Parole Board to specify the particular ‘evidence’ in the inmate’s file or at his interview on which it rests the discretionary determination that an inmate is not ready for conditional release.”[77] The state parole statute at issue in Greenholtz arguably created a “liberty interest” to “some evidence” because it said that the prisoner “shall” be paroled “unless” certain negative conditions applied. But the Court rejected the argument. “The Constitution does not require more” than an opportunity to be heard and a statement telling the prisoner why he was not paroled.[78]
Board, of Pardons v. Allen[79] likewise addresses “shall ... unless” language in a parole statute. Though the language does indeed establish a “liberty interest” protected by the Due Process Clause,[80] the Court nevertheless holds that the parole board retains discretion to make a subjective decision. Allen reaffirms that “the release decision is ... ’necessarily subjective ... and predictive,’ ” and “the discretion of the Board is ‘very broad.’ ”[81] The prisoner’s interest in parole ripens into an entitlement only after the parole board has made the findings that under the statute entitle him to it, which is to say, perhaps tautologically, that a prisoner is entitled to parole only if the parole authority has made the discretionary decision that under the state standard he is entitled to parole.[82]
By way of contrast, good time is neither subjective nor predictive.[83] Loss of good time is instead “a sanction for serious misconduct” in prison, applied after an administrative adjudication.[84] Good time is not, as parole is, a “discretionary assessment of a multiplicity of imponderables, entailing primarily what a man is and what he may be rather than simply what he has *561 done.”[85] Good time entitlement depends on a straight-forward historical determination of what the prisoner has done.
In Wilkinson v. Austin, the Court, addressing prison transfers, distinguishes between parole and good time.[86] Wilkinson likens prison transfer to parole and distinguishes the good time “some evidence” decisions, because, like parole and unlike good time, transfer is discretionary.[87] Accordingly, a prison transfer decision requires only the “nonadversary procedures set forth in Greenholtz,” not the “more formal adversary — type procedures” set forth in Wolff.[88]
Thus, in the absence of state law establishing otherwise, there is no federal constitutional requirement that parole be granted in the absence of “some evidence” of future dangerousness or anything else.
III. The California scheme.
Although the due process clause does not, by itself, entitle a prisoner to parole in the absence of some evidence of future dangerousness, state law may supply a predicate for that conclusion. “[D]espite the necessarily subjective and predictive nature of the parole-release decision, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause.”[89] This poses two questions for us, whether the California parole scheme creates such an interest, and, preliminarily, whether it is necessary to decide whether it does.
The California parole statute provides that the Board of Prison Terms “shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual.”[90] The crucial determinant of whether the prisoner gets parole in California is “consideration of the public safety.”[91]
In California, when a prisoner receives an indeterminate sentence of fifteen years to life, the “indeterminate sentence is in legal effect a sentence for the maximum term, subject only to the ameliorative power of the [parole authority] to set a lesser term.”[92] Under the California parole scheme, the prisoner has a right to a parole hearing and various procedural guarantees and rights before, at, and after the hearing;[93] a right to subsequent hearings at set intervals if the Board of Prison Terms turns him down for parole;[94] and a right to a written explanation if the Governor exercises his authority to overturn the Board of Prison Terms’ recommendation *562 for parole.[95] Under California law, denial of parole must be supported by “some evidence,” but review of the Governor’s decision is “extremely deferential.”[96]
Subsequent to Hayward’s denial of parole, and subsequent to our oral argument in this case, the California Supreme Court established in two decisions, In re Lawrence[97] and In re Shaputis,[98] that as a matter of state law, “some evidence” of future dangerousness is indeed a state sine qua non for denial of parole in California. We delayed our decision in this ease so that we could study those decisions and the supplemental briefs by counsel addressing them. As a matter of California law, “the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety.”[99] There must be “some evidence” of such a threat, and an aggravated offense “does not, in every case, provide evidence that the inmate is a current threat to public safety.” [100] The prisoner’s aggravated offense does not establish current dangerousness “unless the record also establishes that something in the prisoner’s pre- or post-incarceration history, or his or her current demeanor and mental state” supports the inference of dangerousness.[101] Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, “a current threat to public safety.”[102]
Because the California “some evidence” standard is exactly the same as the one Hayward urges as a federal constitutional standard, the doctrine of constitutional avoidance[103] counsels not deciding whether the California parole scheme establishes a predicate for imposing it as a matter of federal constitutional law. State law already does what Hayward would have federal constitutional law do. We therefore do not decide whether a right arises in California under the United States Constitution to parole in the absence of some evidence of future dangerousness. Even if Hayward were correct that he had a federal constitutional right to “some evidence,” it would make no difference, since he has the right to parole in the absence of “some evidence” of future dangerousness under state law.
Since the “some evidence” requirement applies without regard to whether the United States Constitution requires it, we in this case, and courts in this circuit facing the same issue in the *563 future, need only decide whether the California judicial decision approving the governor’s decision rejecting parole was an “unreasonable application”[104] of the California “some evidence” requirement, or was “based on an unreasonable determination of the facts in light of the evidence.” [105] And that conclusion is one that could not be reached on this record, regardless of what level of “AEDPA deference” we applied. The California Superi- or Court concluded that the governor’s rejection of parole was based on “some evidence” of future dangerousness because of “the nature of the commitment offense” and “the somewhat unfavorable psychological and counselor reports.” The reports that impressed the Superior Court said that Hayward would pose a “low” to “moderate” risk of danger if released, as opposed to “no” or merely “low” risk. The court found that the record supported the governor’s judgment that the murder was premeditated and extremely vicious, and could not be attributed merely to “stress” about Hayward’s girlfriend as the parole board had suggested. These two factors combined, in the state court’s view, to establish some evidence of future dangerousness to the public from this murderer.
CONCLUSION
What we are left with is California law establishing a right that Hayward contends is a federal constitutional right, a right to parole in the absence of some evidence of his own future dangerousness to the public. There was some evidence of future dangerousness, so his parole was denied, and the district court correctly denied the writ. The right in California to parole in the absence of some evidence of one’s future dangerousness to the public arises from California law. We overrule any decisions suggesting that the federal constitution imposes a requirement of “some evidence” of future dangerousness without regard to state law.
We have purposely avoided constraining other states to conform to the California system. Other states may have different parole systems or, like the federal system, no parole at all. A state may make parole a matter of grace, or require consideration not only of the inmate’s future dangerousness if released, but also the need for deterrence of others. Or it may decide that the imprecision and unreliability of predictions of future dangerousness make that an inappropriate criterion for parole boards. Or it may decide that justice, respect for victims, and reaffirmation of societal norms,[106] require denial of parole to inmates who have committed terrible crimes regardless of whether they remain dangerous. Or it may decide that it is worth freeing dangerous inmates or inmates who have committed especially heinous crimes to avoid paying medical expenses during their old age. A state may act on the view that age diminishes a prisoner’s inclination to harm others, or that it diminishes only his ability to run fast after he does. It may decide that post-conviction behavior affords a good basis for prediction, or that behavior in prison, where he is guarded and on television monitors 24 hours a day, does not predict post-release conduct as well as how the prisoner behaved the last time he was free. It may rely heavily on prison administrators, psychologists and counselors, or conclude that they cannot see into the prisoner’s soul and are likely to be misled by *564 articulate prisoners who have learned what to say.
We do not intimate that any of these policy choices is constitutionally required or prohibited. Procedurally and substantively, the states have considerable room for play in the joints. The states have “flexibility in deciding what procedures are needed in the context of postconviction relief,”[107] and state postconviction relief procedures may be upset by a federal court “only if they are fundamentally inadequate to vindicate the substantive rights provided.”[108]
Affirmed.

. The Board of Parole Hearings replaced the Board of Prison Terms in July 2005. Cal.Penal Code § 5075(a). For ease of reference, and because both entities have performed the same duties, we refer to both as the Board of Prison Terms, the entity that considered parole for Hayward in 2002.

. See Cal. Const., art. V, § 8(b) ("No decision of the parole authority of this state with respect to the granting, denial, revocation, or suspension of parole of a person sentenced to an indeterminate term upon conviction of murder shall become effective for a period of 30 days, during which the Governor may review the decision subject to procedures provided by statute.”); Cal.Penal Code § 3041.2(a).

. Cal.Penal Code § 3041; see, e.g., In re Lawrence, 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535 (2008); In re Shaputis, 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573 (2008).

. Cal.Penal Code § 3041; Shaputis, 82 Cal. Rptr.3d 213, 190 P.3d at 580.

. California has an unusual appellate procedure for postconviction relief. Instead of appealing an adverse result, the prisoner files an original petition for writ of habeas corpus in the appellate court. See Carey v. Saffold, 536 U.S. 214, 222, 122 S.Ct. 2134, 153 L.Ed.2d 260 (2002).

. 505 F.3d 846, 850-51 (9th Cir.2007).

. Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir.2008).

. We ordered supplemental briefing on these two cases because the decisions were issued after we heard oral argument.

. 82 Cal.Rptr.3d 169, 190 P.3d 535, 562-64 (Cal.2008) (concluding "there does not exist some evidence supporting the conclusion that petitioner continues to pose a threat to public safety”).

. 82 Cal.Rptr.3d 213, 190 P.3d 573, 575 (Cal.2008) (holding that "some evidence in the record supports the Governor’s conclusion that petitioner remains a threat to public safety”).

. 28 U.S.C. § 2254(a).

. “In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.” 28 U.S.C. § 2253(a).

. Id. § 2253(c)(1)(a).

. Id. § 2253(c)(1).

. Id. § 2253(c)(2); see also Doe v. Woodford, 508 F.3d 563, 567 (9th Cir.2007).

. 28 U.S.C. § 2253(c)(1)(A).

. 370 F.3d 1002, 1010 (9th Cir.2004).

. Id.

. Compare Walker v. O'Brien, 216 F.3d 626, 637-39 (7th Cir.2000) (certificate not re *553 quired), with Medberry v. Crosby, 351 F.3d 1049, 1063 (11th Cir.2003), Madley v. U.S. Parole Comm’n, 278 F.3d 1306, 1310 (D.C.Cir.2002), Greene v. Tenn. Dep’t of Corr., 265 F.3d 369, 371-72 (6th Cir.2001), Coady v. Vaughn, 251 F.3d 480, 486 (3d Cir.2001), and Montez v. McKinna, 208 F.3d 862, 868-69 (10th Cir.2000) (certificate required).

. See 28 U.S.C. § 2253(c); Miller-El v. Cockrell, 537 U.S. 322, 336-38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

. Miller-El, 537 U.S. at 336, 123 S.Ct. 1029 (quoting Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)).

. Id. at 338, 123 S.Ct. 1029 (quoting Barefoot v. Estelle, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)).

. Id. at 336-37, 123 S.Ct. 1029.

. Barefoot, 463 U.S. at 892-93, 103 S.Ct. 3383.

. 370 F.3d at 1010.

. 428 F.3d 1229, 1231-32 (9th Cir.2005) (per curiam).

. 28 U.S.C. § 2253(c)(1)(A).

. See cases cited supra note 20.

. Cf. Medberry v. Crosby, 351 F.3d 1049, 1063 (11th Cir.2003); Madley v. U.S. Parole Comm’n, 278 F.3d 1306, 1310 (D.C.Cir.2002); Greene v. Tenn. Dep’t of Corr., 265 F.3d 369, 371-72 (6th Cir.2001); Coady v. Vaughn, 251 F.3d 480, 486 (3d Cir.2001); Montez v. McKinna, 208 F.3d 862, 868-69 (10th Cir. 2000); contra Walker v. O’Brien, 216 F.3d 626, 637-39 (7th Cir.2000).

. 28 U.S.C. § 2253(c)(1)(a).

. Madley, 278 F.3d at 1310.

. Miller-El 537 U.S. at 336, 123 S.Ct. 1029.

. See, e.g., Wilson v. Belleque, 554 F.3d 816, 827-28 (9th Cir.2009); Morales v. Woodford, 388 F.3d 1159, 1167-68 (9th Cir.2004); U.S. v. Martin, 226 F.3d 1042, 1046-47 (9th Cir. 2000)!

. Wilson, 554 F.3d at 827-28; Morales, 388 F.3d at 1167-68; Martin, 226 F.3d at 1046-47.

. 28 U.S.C. § 2253(c)(2).

. 505 F.3d 846 (9th Cir.2007).

. Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir.2008).

. 334 F.3d 910 (9th Cir.2003).

. 461 F.3d 1123 (9th Cir.2006).

. 505 F.3d at 850-51.

. Hayward v. Marshall, 512 F.3d 536, 542 (9th Cir.2008).

. Our panel decision in this case, Hayward v. Marshall, 512 F.3d 536 (9th Cir.2008) is vacated.

. Compare Superintendent v. Hill, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (assessing a Massachusetts good time statute) with Board of Pardons v. Allen, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (assessing the Montana parole system) and Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (assessing the Nebraska parole system).

. 18 U.S.C. § 3624(b)(1).

. Hill, 472 U.S. at 454, 105 S.Ct. 2768.

. See, e.g., Ala.Code § 14-9-41; Alaska Stat. § 33.20.010; Ariz.Rev.Stat. Ann. §§ 41-1604.07, 41-1604.10; Ark.Code Ann. §§ 12-29-201, 12-29-205; Cal.Penal Code §§ 2932-2933; Colo.Rev.Stat. §§ 17-22.5-201, -301; Conn. Gen.Stat. § 18-7a; Del.Code Ann. tit. 11, §§ 4381, 4348; D.C.Code § 24-221.01; Kan. Stat. Ann. §§ 21-4706, -4722; La.Rev. Stat. Ann. § 15:571.3; Md.Code Ann. Corr. Servs. §§ 3-704; Mass. Gen. Laws Ann. ch. 127, § 129C; Mo. Ann. Stat. § 558.041; Nev. Rev.Stat. §§.209.433, .447; N.H.Rev.Stat. Ann. § 651-A:22; N.J. Stat. Ann. § 30:4-140; Okla. Stat. tit. 57, §§ 65, 138; Or.Rev.Stat. § 169.110; S.C.Code Ann. § 24-13-210; Tenn. Code Ann. § 41-2-111; Tex. Gov’t Code Ann. §§ 498.002 -.004; Va.Code Ann. § 53.1-193-. 196; W. Va.Code Ann. § 31-20-5d; Wis. Stat. Ann. § 302.43; Wyo. Stat. Ann. § 7-13-420.

. Alaska Stat. § 33.20.010(a) (emphasis added).

. Cal.Code Regs. tit. 15, § 3043 (emphasis added); see also Cal.Penal Code §§ 2901, 2901.5, 2930-2935, 4091.

. Cal.Penal Code § 2932; see also Cal.Code Regs. tit. 15, § 3323.

. See Cal.Penal Code § 2931(b); Hill, All U.S. at 454, 105 S.Ct. 2768.

. Hill, 472 U.S. at 454, 105 S.Ct. 2768.

. Cal.Penal Code § 2932.

. Cal.Penal Code § 2930(a) ("The Department of Corrections shall inform every prisoner ... not later than 14 days after reception in prison, of all applicable prison rules and regulations including the possibility of receiving a one-third reduction of the sentence for good behavior and participation.”).

. See Hill, 472 U.S. at 454, 105 S.Ct. 2768.

. Greenholtz, 442 U.S. at 10, 99 S.Ct 2100 (internal quotation marks omitted).

. Sentencing Reform Act of 1984, Pub.L. No. 98-473, tit. II, § 218(a)(5), 98 Stat. 1837, 2027 (1984).

. See, e.g., Alaska Stat. §§ 33.16.010, 33.16.090, 33.16.100; Ariz.Rev.Stat. Ann. §§ 31-411, 31-412, 41-1604.09; Cal.Penal Code §§ 3040-3070; Colo.Rev.Stat. Ann. §§ 17-2-102, -2-201, -22.5 -104, -22.5 -303 (parole), -22.5 -403 (parole eligibility), -22.5-404 (parole guidelines); Conn. Gen.Stat. §§ 54-125a (eligibility), -125g; Del.Code Ann. tit. 11 §§ 4346 (eligibility) — 4347 (parole procedure); Fla. Stat. Ann. §§ 947.16 (parole eligibility), .165 (parole guidelines); Ga.Code Ann. §§ 42-9-40 (parole guidelines), -9-45 (parole eligibility); Haw.Rev.Stat. §§ 353-61, -72 (parole procedure); Idaho Code Ann. § 20-223; Ill. Comp. Stat. 5/3-3-3 (parole eligibility), -4 (parole hearing); Kan. Ann. Stat. §§ 22-3717 (parole eligibility); Ky.Rev. Stat. § 439.340 (parole guidelines); La.Rev. Stat. Ann. § 15:574.4 (parole eligibility); Md. Code Ann. Corr. Servs. §§ 4-305 (parole), 7-301 (parole eligibility); Mass. Gen. Laws Ann. ch. 127 §§ 130 (granting parole), 133 (parole eligibility), 133A (parole eligibility); Mich. Comp. Laws Ann. §§ 791.233 (granting parole)-.233b (parole eligibility); Minn.Stat. Ann. § 609.12 (parole); Mo.Code Ann. § 47-7-3 (parole eligibility); Miss. Ann. Stat. § 217.690 (parole eligibility); Mont.Code Ann. § 46-23-201 (parole eligibility); Neb. Rev.Stat. Ann. §§ 83-1, 112, 83-4,143; Nev. Rev.Stat. §§ 213.1099-, 145; N.J. Stat. Ann. § 30:4-123.51 (parole eligibility).

. Alaska Stat. § 33.16.100.

. Id. § 33.16.090(b)(1). When a prisoner does not receive “discretionary parole” he may still be released because of a good time reduction from his sentence resulting in "mandatory parole.” Id. § 33.16.900(8).

. Id. § 33.16.100(a).

. Other states in our circuit have varying schemes. In Arizona, once a prisoner is certified as eligible for parole, the board of executive clemency decides whether to parole him, but has "sole discretion” to decide whether "there is a substantial probability that the applicant will remain at liberty without violating the law and that the release is in the best interests of the state.” Ariz.Rev.Stat. Ann. § 31—412(A); see also Cooper v. Arizona Bd. of Pardons and Paroles, 149 Ariz. 182, 717 P.2d 861, 864, 865 (1986) (holding that "the age of the victim and the seriousness of the offense” were valid grounds to deny parole, and stating that the "criterion set forth by the legislature for making such a [parole eligibility ] determination is so broad that it hardly curtails the Board's discretion at all."). In Oregon, a prisoner sentenced as a dangerous offender "shall be given a release date ... if the board finds the prisoner no longer dangerous or finds that the prisoner remains dangerous but can be adequately controlled with supervision and mental health treatment and that the necessary resources for supervision and treatment are available to the prisoner.” Or.Rev.Stat. § 144.228(1)(b)(A). In Nevada, when determining whether to release an eligible prisoner on parole, the Board "shall consider” not only "[w]hether there is a reasonable probability that the prisoner will live and remain at liberty without violating the laws” but also "[wjhether the release is incompatible with the welfare of society; [and the] seriousness of the offense and the history of criminal conduct of the prisoner....” Nev. Rev.Stat. § 213.1099(2). See also Idaho Code Ann. § 20-223(c) ("best interests of society"). Hawaii provides that "[p]aroles may be granted by the Hawaii paroling authority at any time after the prisoner has served the minimum term of imprisonment,” Haw.Rev.Stat. § 353-68(a), but "[p]arole shall not be granted unless it appears to the Authority that there is a reasonable probability that the inmate concerned will live and remain at liberty without violating the law and that the inmate's release is not incompatible with the welfare and safety of society,” Haw.Code R. § 23-700-33.

. See, e.g., Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 13, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); Wolff v. McDonnell, 418 U.S. 539, 561, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

. 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

. Id. at 561, 94 S.Ct. 2963.

. Id. at 564-65, 94 S.Ct. 2963 (quoting Morrissey v. Brewer, 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)); see also Irons v. Carey, 506 F.3d 951, 954 (9th Cir.2007) (Kleinfeld, J., dissenting from denial of rehearing en banc).

. Wolff, 418 U.S. at 565, 94 S.Ct. 2963; see also Irons, 506 F.3d at 954.

. Superintendent v. Hill, All U.S. at 454, 105 S.Ct. 2768; see also Irons, 506 F.3d at 954-55.

. See Wolff, 418 U.S. at 561, 94 S.Ct. 2963.

. See Wilkinson v. Austin, 545 U.S. 209, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005); Bd. of Pardons v. Allen, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987); Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

. 442 U.S. at 7, 99 S.Ct 2100.

. Id. at 9, 99 S.Ct. 2100 (internal quotation marks omitted).

. Id. at 10, 99 S.Ct. 2100.

. Id. at 13, 99 S.Ct. 2100.

. Id. at 8, 99 S.Ct 2100.

. Id. at 15, 99 S.Ct. 2100.

. Id. at 16, 99 S.Ct. 2100.

. 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

. Id. at 381, 107 S.Ct. 2415.

. Id. (quoting Greenholtz, 442 U.S. at 13, 99 S.Ct. 2100).

. Greenholtz controls the due process inquiry for a denial of parole. In the prison context, however, the Supreme Court has backed away from "the search for a negative implication from mandatory language in prisoner regulations.” Sandin v. Conner, 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). "After Sandin," then, "it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.' " Wilkinson v. Austin, 545 U.S. 209, 222-23, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (quoting Sandin, 515 U.S. at 484, 115 S.Ct. 2293).

. See Superintendent v. Hill, 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

. Wolff v. McDonnell, 418 U.S. 539, 561, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

. Greenholtz, 442 U.S. at 10, 99 S.Ct. 2100.

. 545 U.S. 209, 228-29, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005).

. Id.

. Id.

. Bd. of Pardons v. Allen, 482 U.S. 369, 371, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (emphasis added and citation omitted).

. Cal.Penal Code § 3041(b).

. In re Lawrence, 44 Cal.4th 1181, 82 Cal. Rptr.3d 169, 190 P.3d 535, 549 (2008); In re Shaputis, 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573, 582 (2008).

. People v. Wingo, 14 Cal.3d 169, 121 Cal. Rptr. 97, 534 P.2d 1001, 1011 (1975) (internal quotation marks and citation omitted); see also In re Dannenberg, 34 Cal.4th 1061, 23 Cal.Rptr.3d 417, 104 P.3d 783, 804 (2005).

. Cal.Penal Code § 3041.5.

. Id.

. Id. § 3041.2.

. In re Rosenkrantz, 29 Cal.4th 616, 128 Cal. Rptr.2d 104, 59 P.3d 174, 210 (2002).

. 44 Cal.4th 1181, 82 Cal.Rptr.3d 169, 190 P.3d 535, 549 (2008).

. 44 Cal.4th 1241, 82 Cal.Rptr.3d 213, 190 P.3d 573, 582 (2008).

. Lawrence, 82 Cal.Rptr.3d 169, 190 P.3d at 552.

. Id., 82 Cal.Rptr.3d 169, 190 P.3d at 554.

. Id., 82 Cal.Rptr.3d 169, 190 P.3d at 555.

. Id., 82 Cal.Rptr.3d 169, 190 P.3d at 539.

. Escambia County v. McMillan, 466 U.S. 48, 51, 104 S.Ct. 1577, 80 L.Ed.2d 36 (1984) (per curiam) ("It is a well established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.”); Lee v. Walters, 433 F.3d 672, 677 (9th Cir.2005) (" 'A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.’ ”) (quoting Lyng v. Nw. Indian Cemetery Protective Ass’n, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988)).

. 28 U.S.C. § 2254(d)(1).

. 28 U.S.C. § 2254(d)(2).

. State v. Chaney, 477 P.2d 441, 446 (Alaska 1970).

. Dist. Attorney's Office v. Osborne,-U.S. -, 129 S.Ct. 2308, 2320, 174 L.Ed.2d 38 (June 18, 2009).

. Id.